FILED by __YH__ D.C.

**Apr 22, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

## 21-80063-CR-MIDDLEBROOKS/BRANNON

Case No.

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(2)(A)
18 U.S.C. § 1957(a)
18 U.S.C. § 1343
18 U.S.C. § 2
18 U.S.C. § 982(a)(1), (a)(2)(A), (a)(7)

**UNITED STATES OF AMERICA**

**vs.**

**CHRISTOPHER LICATA,**

         **Defendant.**

_____/

### INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

#### Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

1

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.     Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.     Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.     A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## Part B Coverage and Regulations

6.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7.     First Coast Services Options, Inc. ("First Coast") was the MAC for the consolidated Medicare jurisdictions that covered Florida, Puerto Rico, and the U.S. Virgin Islands.

8.     To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement.   The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.  CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.   The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

9.     CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10.    Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary.  For this to occur, the beneficiary would assign the right of payment to the health care provider.  Once such an assignment took place, the health

3

care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

**Laboratory Tests**

**COVID-19 Testing and Respiratory Pathogen Panel ("RPP") Testing**

11.     COVID-19 testing assessed whether an individual had the novel coronavirus disease 2019, commonly referred to as "COVID-19."

12.     RPP testing detected certain respiratory viruses and bacterial pathogens.  The RPP test did not and could not test for COVID-19.  Medicare reimbursement rates for RPP testing were approximately four times higher than Medicare reimbursement rates for the COVID-19 test.

**Genetic Testing**

13.     Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future, including certain types of cancers (known as cancer genetic or "CGx" testing), cardiovascular disease, diabetes, obesity, Parkinson's disease, Alzheimer's disease, and dementia. Pharmacogenetic tests ("PGx" tests) were laboratory tests that used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications.

**Medicare Regulations**

14.     Except for certain statutory exceptions, Medicare did not cover laboratory testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  Title 42, United States Code, Section 1395y(a)(1)(A).

15.     If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional

4

requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

16.     In or around May 2020, in response to the public health emergency for the COVID-19 pandemic, Medicare amended Title 42, Code of Federal Regulations, Section 410.32(a) to remove the requirement that COVID-19 tests and certain, defined RPP tests may be covered only based on the order of a treating physician. Under the interim policy, Medicare covered COVID-19 tests and certain, defined RPP tests when ordered by any healthcare professional authorized to do so under state law. This interim policy did not amend Title 42, Code of Federal Regulations, Section 410.32(a) as it applies to genetic testing.

### Telemedicine

17.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

18.     Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

19.     Medicare Part B covered expenses for specific telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural

or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner. In or around March 2020, in response to the COVID-19 pandemic, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

### Shell Lab Rule

20.     Title 42, United States Code, Section 1395l(h)(5) provided that payment from Medicare for covered clinical diagnostic laboratory tests may only be made to "the person or entity which performed or supervised the performance of such test." If a test was "performed at the request of a laboratory by another laboratory," the referring laboratory could only be paid by Medicare for that test if "not more than 30 percent of the clinical diagnostic laboratory tests for which such referring laboratory … receives requests for testing during the year in which the test is performed, are performed by another laboratory." *Id.* This was commonly called the "shell lab rule," as it, in essence, precluded pass-through billing arrangements where a lab bills Medicare for more than 30 percent of the tests that were actually performed by another lab.

### Paycheck Protection Program and Economic Injury Disaster Relief Program

### The Small Business Administration

21.     The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by

enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

22.     As part of this effort, the SBA facilitated loans through banks, credit unions, and other lenders. The federal government backed these loans.

### The Paycheck Protection Program

23.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

24.     In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. One such affirmative certification was that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law." In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) also was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

25.     A PPP loan application was processed by a participating financial institution ("lender"). If a PPP loan application was approved, the participating lender funded the loan using its own monies. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

26.     PPP loan proceeds were required to be used by the business on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business was eligible for the PPP loan it received, spent the loan proceeds on these permissible expense items within a designated period of time, and used a defined portion of the PPP loan proceeds for payroll expenses.

### The Economic Injury Disaster Loan Program

27.     The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

28.     Another source of relief provided by the CARES Act was the authorization for the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

29.     In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.  The applicant was further required to certify that it was not engaged in any illegal activity and that all of the information in the application was true and correct to the best of the applicant's knowledge.

30.     EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor, Rapid Finance.  The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above.  Any funds issued under an EIDL or advance were issued directly by the SBA.  EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

### Relevant Lending Institution

31.     Lender 1 was a financial institution within the meaning of Title 18, United States Code, Section 20, with accounts insured by the Federal Deposit Insurance Corporation, and headquartered in New Jersey.  Lender 1 was authorized to participate as a lender in the PPP by the SBA.

### The Defendant and Related Entities

32.     Boca Toxicology, LLC (d/b/a Lab Dynamics) ("Boca Toxicology") was a limited liability company formed under the laws of Florida, with its principal place of business in Palm

Beach County, Florida, and held a bank account ending in 7233 at TD Bank (the "Boca Toxicology Account").

33.     Boca Toxicology purportedly provided genetic, RPP, COVID-19, and other laboratory testing services to beneficiaries.

34.     Corporate Boca Tox CL Inc. was a company incorporated under the laws of Delaware, and held a bank account ending in 7613 at TD Bank (the "Corporate Boca Tox CL Account").

35.     Defendant **CHRISTOPHER LICATA**, a resident of Palm Beach County, Florida, was the owner of Boca Toxicology and Corporate Boca Tox CL Inc.  **LICATA** held an account at E-Trade Financial Securities LLC ending in 0417 (the "**CHRISTOPHER LICATA** Account").

36.     Company A was a company incorporated under the laws of Florida, with its principal place of business in Broward County, Florida.

37.     Individual A and Individual B, both residents of Broward County, Florida, co-owned Company A.  Individual A held an account ending in 8592 at USAA Bank (the "Individual A Account").

38.     Company B was a company incorporated under the laws of Florida, with its principal place of business in Palm Beach County, Florida.

39.     Individual C, a resident of Palm Beach County, owned and operated Company B.

### COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.      Paragraphs 1 through 20, 32 through 33, and 35 through 39 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around December 2018, and continuing through the return of this Indictment, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**CHRISTOPHER LICATA,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Individual A, Individual B, Individual C, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.      to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly, and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

**Purpose of the Conspiracy**

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things:  (a) paying and receiving kickbacks in exchange for the referral of beneficiaries, COVID-19, RPP, genetic, and other tests, and doctors' orders and other documentation necessary to submit claims to Medicare (collectively, "doctors' orders") to Boca Toxicology so that Boca Toxicology could bill Medicare for the testing purportedly provided to these beneficiaries, without regard to whether the beneficiaries needed the tests or whether the tests were eligible for Medicare reimbursement; (b) paying and causing the payment of kickbacks to telemedicine companies in exchange for ordering and arranging for the ordering of genetic testing for beneficiaries, without regard to the medical necessity of the prescribed tests or whether the tests were eligible for Medicare reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare through Boca Toxicology for genetic testing and RPP testing that was not medically necessary and not eligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

**Manner and Means of the Conspiracy**

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.      **CHRISTOPHER LICATA** falsely certified to Medicare that he, as well as Boca Toxicology, would comply with all Medicare rules and regulations and federal laws, including the shell lab rule, the Anti-Kickback Statute, the requirement to not knowingly present or cause to be

presented a false and fraudulent claim for payment by Medicare, and the requirement to not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

5.      **CHRISTOPHER LICATA** and his co-conspirators, through Boca Toxicology, paid and caused to be paid kickbacks and bribes to co-conspirators, including Individual A, Individual B, Individual C, and others, in exchange for referring beneficiaries, COVID-19, RPP, genetic, and other tests and corresponding doctors' orders to Boca Toxicology so that Boca Toxicology could submit claims, via interstate wire communication, to Medicare for the tests.

6.      As a result of the kickbacks and bribes that **CHRISTOPHER LICATA** paid Individual A, Individual B, Individual C, and other co-conspirators, through Boca Toxicology, in exchange for referring beneficiaries to Boca Toxicology, **LICATA** denied beneficiaries the ability to choose which laboratory, if any, they desired to perform their laboratory testing.

7.      **CHRISTOPHER LICATA**, Individual A, Individual B, Individual C, and other co-conspirators created and caused to be created sham documentation that disguised the kickbacks and bribes, as payment from Boca Toxicology for other services, such as for legitimate employment and for hourly marketing services.

8.      **CHRISTOPHER LICATA** instructed his co-conspirators, including Individual A, Individual B, and others, to obtain doctors' orders for specific types of genetic tests, in effect selecting which genetic tests the recruited beneficiaries received. **LICATA** selected the genetic tests based on how much Medicare reimbursed for the tests, irrespective of medical necessity and eligibility for Medicare reimbursement, and for the purpose of maximizing reimbursements.

9.      **CHRISTOPHER LICATA** instructed his co-conspirators, including Individual A, Individual B, and others, that if they referred beneficiaries to Boca Toxicology for COVID-19 testing, they should also obtain doctors' orders for more expensive, but medically unnecessary,

RPP tests, because the COVID-19 tests did not reimburse at a sufficiently high rate, and the RPP tests reimbursed at a higher rate.

10.    **CHRISTOPHER LICATA**, Individual A, Individual B, and other co-conspirators obtained doctors' orders for COVID-19, RPP, and genetic testing from Individual B's father, a medical doctor, who often authorized the tests without properly consulting with the beneficiaries about the specific tests being performed, the purposes of those tests, the need for the tests, and the risks of the test, and did not use the test results in the treatment of the beneficiaries.

11.    **CHRISTOPHER LICATA**, Individual A, Individual B, and other co-conspirators offered and paid, and caused to be paid, illegal kickbacks and bribes to telemedicine companies in exchange for doctors' orders for laboratory tests, including genetic tests, that were not medically necessary and not eligible for Medicare reimbursement. The orders were written by doctors contracted with the telemedicine companies, even though those doctors had no prior relationship with the beneficiaries, were not treating the beneficiaries, did not use the test results in the treatment of the beneficiaries, and often did not conduct a proper telemedicine visit.

12.    **CHRISTOPHER LICATA**, Individual A, Individual B, and other co-conspirators caused Boca Toxicology to submit false and fraudulent claims to Medicare, via interstate wire communication, in at least the approximate amount of $8,424,141 for genetic tests that were induced through kickbacks, designed for maximum reimbursement, not medically necessary, and not eligible for reimbursement. As the result of these false and fraudulent claims, Medicare made payments to Boca Toxicology for genetic testing in at least the approximate amount of $3,394,011.

13.    **CHRISTOPHER LICATA**, Individual A, Individual B, and other co-conspirators caused Boca Toxicology to submit false and fraudulent claims to Medicare, via interstate wire communication, in at least the approximate amount of $260,975 for RPP tests that were induced

through kickbacks, designed for maximum reimbursement, not medically necessary, and not eligible for reimbursement. As the result of these false and fraudulent claims, Medicare made payments to Boca Toxicology for RPP testing in at least the approximate amount of $148,494.

14. In total, **CHRISTOPHER LICATA**, Individual A, Individual B, and other co-conspirators caused Boca Toxicology to submit claims to Medicare in at least the approximate amount of $9,321,875, via interstate wire communication. Medicare made payments to Boca Toxicology in at least the approximate amount of $3,775,510.

15. **CHRISTOPHER LICATA**, Individual A, Individual B, and other co-conspirators used the fraud proceeds received from Medicare to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-6
### Health Care Fraud
### (18 U.S.C. § 1347)

1. Paragraphs 1 through 20, 32 through 33, and 35 through 39 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around December 2018, and continuing through the return of this Indictment, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### CHRISTOPHER LICATA,

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section

15

24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit program.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by, among other things:  (a) paying and receiving kickbacks in exchange for the referral of beneficiaries, COVID-19, RPP, genetic, and other test kits, and doctors' orders to Boca Toxicology so that Boca Toxicology could bill Medicare for the testing purportedly provided to these beneficiaries, without regard to whether the beneficiaries needed the tests or whether the tests were eligible for Medicare reimbursement; (b) paying and causing the payment of kickbacks to telemedicine companies in exchange for ordering and arranging for the ordering of genetic testing for beneficiaries, without regard to the medical necessity of the prescribed tests or whether the tests were eligible for Medicare reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare through Boca Toxicology for genetic testing and RPP testing that was not medically necessary and not eligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### The Scheme and Artifice

4.      The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## Acts in Execution or Attempted Execution
## of the Scheme and Artifice

5.      On or about the dates set forth as to each count below, in Palm Beach County, in

the Southern District of Florida and elsewhere, the defendant,

### CHRISTOPHER LICATA,

in connection with the delivery of and payment for health care benefits, items, and services, did

knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice

to defraud a health care benefit program affecting commerce, as defined by Title 18, United States

Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent

pretenses, representations, and promises, money and property owned by, and under the custody

and control of, said health care benefit program, in that the defendant submitted and caused the

submission of false and fraudulent claims, seeking the identified dollar amounts, and representing

that such benefits, items, and services were medically necessary, eligible for Medicare

reimbursement, and provided to beneficiaries as claimed:

| Count | Beneficiary | Approx. Date of Submission of Claim | Claim No. | Description for Highest Billed Test; Total Approx. Amount Billed |
|:---:|:---:|:---:|:---:|:---:|
| 2 | M.L. | 5/24/2019 | 591019144831610 | Gene analysis (BRCA1 and 2); $9,771 |
| 3 | S.S. | 3/3/2020 | 591020063741200 | Gene analysis (Noonan Syndrome); $15,083 |
| 4 | S.A. | 4/23/2020 | 590920114482670 | Molecular Pathology Procedure Level 9; $8,314 |
| 5 | H.S. | 5/7/2020 | 591020140273110 | RPP; $1,091 |
| 6 | M.S. | 5/14/2020 | 591020135066900 | RPP; $1,091 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 7
### Conspiracy to Defraud the United States and to Pay Health Care Kickbacks
### (18 U.S.C. § 371)

1.      Paragraphs 1 through 20, 32 through 33, and 35 through 39 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around December 2018, and continuing through the return of this Indictment, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### CHRISTOPHER LICATA,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Individual A, Individual B, and others known and unknown to the Grand Jury to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the HHS in its administration and oversight of the Medicare program; and to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by:  (a) soliciting, receiving, offering, and paying kickbacks and

bribes in return for recruiting and referring beneficiaries to Boca Toxicology; (b) submitting and causing the submission of claims to Medicare for COVID-19, RPP, genetic, and other forms of laboratory testing that Boca Toxicology purported to provide to those beneficiaries; (c) concealing the submission of false and fraudulent claims to Medicare; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

**Manner and Means**

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.    Co-conspirators, including Individual A, Individual B, and others, recruited and referred beneficiaries to Boca Toxicology, knowing that Boca Toxicology would bill Medicare for COVID-19, RPP, genetic, and other forms of laboratory testing purportedly provided to the recruited beneficiaries.

5.    **CHRISTOPHER LICATA**, through Boca Toxicology, offered and paid at least $238,240 in kickbacks to co-conspirators, including Individual A, Individual B, and others, in exchange for the recruitment and referral of beneficiaries to Boca Toxicology, knowing that Boca Toxicology would bill for testing purportedly provided to the recruited beneficiaries.

6.    **CHRISTOPHER LICATA**, Individual A, Individual B, and other co-conspirators created and caused to be created sham documentation that disguised the kickbacks and bribes as payments from Boca Toxicology for other services, including legitimate employment and for hourly marketing services.

7.    **CHRISTOPHER LICATA**, Individual A, Individual B, and other co-conspirators caused Boca Toxicology to submit claims to Medicare, via interstate wire communications, in at

least the approximate amount of $9,321,875 for COVID-19, RPP, genetic, and other forms of laboratory testing that were induced through kickbacks and bribes.

8.      As a result of these claims, Medicare made payments to Boca Toxicology in at least the approximate amount of $3,774,510.

9.      **CHRISTOPHER LICATA** used the fraud proceeds received from Boca Toxicology to benefit himself and others, and to further the fraud.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about May 7, 2018, **CHRISTOPHER LICATA** signed CMS Form 855B, in which he certified that, among other things, Boca Toxicology would comply with the federal Anti-Kickback Statute.

2.      In or around January 2019, **CHRISTOPHER LICATA**, Individual A, Individual B, and Individual C negotiated an arrangement whereby Company A would receive approximately 45% of the amount that Medicare reimbursed for testing for beneficiaries Individual A and Individual B referred to Boca Toxicology.  Under the agreed arrangement, payments from **LICATA** to Individual A and Individual B would flow through Individual C, who the parties agreed would receive 10% of what Medicare reimbursed, to be paid to Company B, in exchange for Individual C's role in brokering the agreement.

3.      On or about April 29, 2019, **CHRISTOPHER LICATA** signed check no. 687 in the amount of approximately $5,000 from the Boca Toxicology Account made payable to

Company B, which was a kickback for beneficiaries Individual A and Individual B referred to Boca Toxicology for laboratory testing.

4.      On or about April 30, 2019, Individual A emailed Individual C a false and fraudulent invoice from Company A to Company B, which was prepared in order to disguise the kickback payment from **CHRISTOPHER LICATA** that Company B would be passing on to Company A. The invoice falsely reflected that Company A had performed "Genomics education and assessments" for 10 hours at the rate of $450 per hour, for a total of $4,500.

5.      On or about May 1, 2019, Company B transferred approximately $4,500 to Company A via wire transfer, which represented the portion of the kickback **CHRISTOPHER LICATA** owed to Company A.

6.      On or about June 8, 2019, **CHRISTOPHER LICATA** signed check no. 710 in the amount of approximately $5,000 from the Boca Toxicology Account made payable to Company B, which was a kickback for beneficiaries Individual A and Individual B referred to Boca Toxicology for laboratory testing.

7.      On or about June 11, 2019, Individual A emailed Individual C a false and fraudulent invoice from Company A to Company B, which was prepared in order to disguise the kickback payment from **CHRISTOPHER LICATA** that Company B would be passing on to Company A. The invoice falsely reflected that Company A had performed "Genomics education and assessments" for 10 hours at the rate of $450 per hour, for a total of $4,500.

8.      On or about June 12, 2019, Company B transferred approximately $4,470 to Company A via wire transfer, which represented the portion of the kickback **CHRISTOPHER LICATA** owed to Company A, minus the wire transfer fee.

9.  On or about July 3, 2019, after **CHRISTOPHER LICATA** had observed the volume of referrals from Individual A and Individual B for several months, **LICATA** sent an iMessage to Individual A enclosing a copy of Internal Revenue Service ("IRS") Form W-4, so that Individual A could be reflected as a salaried employee of Boca Toxicology, when in fact Individual A was not an employee of Boca Toxicology. **LICATA** and Individual A negotiated a monthly salary of approximately $24,000 to reflect the historical volume of referrals and the taxes that Individual A would have to pay on salary payments. **LICATA** and Individual A agreed that only Individual A, not Individual B, would be reflected as an employee and that Individual A would split the purported salary payments with Individual B.

10.  On or about July 3, 2019, Individual A sent an iMessage to **CHRISTOPHER LICATA** noting that, under the employment arrangement, Individual A would be "[l]oosing [sic] 3500 in fica and taxes[.] Ouch[.]"  In response, **LICATA** reassured Individual A that Individual A "will get bonuses as time goes on with sales performance."

11.  On or about July 12, 2019, **CHRISTOPHER LICATA** signed check no. 10002 in the amount of approximately $7,199 from the Boca Toxicology Account made payable to Individual A, which represented a kickback payment in exchange for beneficiaries Individual A and Individual B referred to Boca Toxicology for laboratory testing.

12.  On or about September 20, 2019, **CHRISTOPHER LICATA** caused approximately $8,473 to be paid into the Individual A Account, in the form of a direct deposit from Payroll Company 1 that was funded by the Boca Toxicology Account, which represented a kickback payment in exchange for beneficiaries Individual A and Individual B referred to Boca Toxicology for laboratory testing.

13.     On or about June 25, 2020, Individual A sent iMessages to **CHRISTOPHER LICATA** containing a breakdown of testing that Boca Toxicology had performed for beneficiaries that Individual A and Individual B had referred to Boca Toxicology in or around April and May 2020. Individual A informed **LICATA** that in April 2020 the beneficiaries had received the following tests: "1 CGX[,] 1 Diabetes[,] 2 PGX[,] 75 RPP – all Medicare[,] 21 UTI[,] 1 Wound," and noted that "The molecular alone cover 75k." Individual A also informed **LICATA** that in May 2020 the beneficiaries had received the following tests: "7 diabetes[,] 1 CGx[,] 18 urines[,] and 193 covid/rpp[.]" Based on these numbers, Individual A asked **LICATA**, "How are you loosing[?] [sic]… The rpp alone covers the 75k."

14.     On or about June 25, 2020, **CHRISTOPHER LICATA** caused approximately $7,944 to be paid into the Individual A Account, in the form of a direct deposit from Payroll Company 1 that was funded by the Boca Toxicology Account, which represented a kickback payment in exchange for beneficiaries Individual A and Individual B referred to Boca Toxicology.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 8-12
### Payment of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(2)(A))

1.     Paragraphs 1 through 20, 32 through 33, and 35 through 39 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about the dates enumerated below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**CHRISTOPHER LICATA,**

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, directly

and indirectly, overtly and covertly, in cash and in kind, as set forth below, to a person, to induce

such person to refer an individual to a person for the furnishing and arranging for the furnishing

of any item and service for which payment may be made in whole and in part under a Federal

health care program, that is, Medicare:

| Count | Approx. Date of Kickback Payment | Approx. Amt. of Kickback Payment | Description of Kickback Payment |
|-------|----------------------------------|----------------------------------|-------------------------------|
| 8 | 4/29/2019 | $5,000 | Check no. 687 from the Boca Toxicology Account made payable to Company B. |
| 9 | 6/8/2019 | $5,000 | Check no. 710 from the Boca Toxicology Account made payable to Company B. |
| 10 | 7/12/2019 | $7,199 | Check no. 10002 from the Boca Toxicology Account made payable to Individual A. |
| 11 | 9/20/2019 | $8,473 | Direct deposit from Payroll Company 1, withdrawn from the Boca Toxicology Account, to the Individual A Account. |
| 12 | 6/25/2020 | $7,944 | Direct deposit from Payroll Company 1, withdrawn from the Boca Toxicology Account, to the Individual A Account. |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18,

United States Code, Section 2.

### COUNTS 13-15
### Money Laundering
### (18 U.S.C. § 1957(a))

1.      The Paragraphs 1 through 20, 32 through 33, and 35 through 39 of the General

Allegations section of this Indictment are re-alleged and incorporated by reference as though fully

set forth herein.

2.      On or about the dates set forth as to each count below, in Palm Beach County, in

the Southern District of Florida, and elsewhere, the defendant,

**CHRISTOPHER LICATA,**

did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, and such property having been derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity:

| Count | Approx. Date of Transaction | Approx. Amount of Transaction | Description of Monetary Transaction |
|-------|------------------------------|-------------------------------|-------------------------------------|
| 13 | 7/17/2019 | $200,000 | Bank transfer from the Boca Toxicology Account to the Corporate Boca Tox CL Account. |
| 14 | 8/5/2019 | $100,000 | Bank transfer from the Boca Toxicology Account to the Corporate Boca Tox CL Account. |
| 15 | 8/5/2019 | $300,000 | Wire transfer from the Corporate Boca Tox CL Account to the **CHRISTOPHER LICATA** Account. |

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and payment of kickbacks in connection with a Federal health care program, in violation of Title 42, United States Code, 1320a-7b.

In violation of Title 18, United States Code, Sections 1957(a) and 2.

### COUNTS 16-17
### Wire Fraud
### (18 U.S.C. § 1343)

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2.     From in or around March 2020, and continuing through the return of this Indictment, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**CHRISTOPHER LICATA,**

did knowingly, and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Scheme and Artifice

3.     It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by: (a) submitting and causing the submission, via interstate wire communication, of false and fraudulent applications for loans and grants made available through the SBA to provide relief for the economic effects caused by the COVID-19 pandemic, including a PPP loan and an EIDL; (b) diverting fraud proceeds for their personal use, the use and benefit of others, and to further the fraud; and (c) concealing and causing the concealment of these false and fraudulent applications.

### The Scheme and Artifice

4.     On or about March 30, 2020, **CHRISTOPHER LICATA** submitted, and caused the submission of, an EIDL intake application in the name of Boca Toxicology seeking an EIDL (the "EIDL Application"). In the EIDL Application, **LICATA** falsely represented, among other

26

things, that Boca Toxicology was "not engaged in any illegal activity," that Boca Toxicology's gross revenues for the twelve months prior to the date of the disaster were $1,600,000, and that Boca Toxicology's cost of goods sold for the twelve months prior to the date of the disaster were $800,000.

5.      On or about April 24, 2020, **CHRISTOPHER LICATA** submitted, and caused the submission of, a PPP loan application in the name of Boca Toxicology seeking a PPP loan in the amount of approximately $50,250 (the "PPP Application"). In the PPP Application, **LICATA** falsely represented that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law" and that Boca Toxicology had seven employees and an average monthly payroll of approximately $20,100.

6.      As a result of the false and fraudulent PPP Application, Lender 1 approved and funded the PPP loan. On or about May 5, 2020, Lender 1 transferred approximately $50,250 to the Boca Toxicology Account.

7.      As a result of the false and fraudulent EDIL Application, SBA approved the EIDL. On or about May 14, 2020, **CHRISTOPHER LICATA** submitted, and caused the submission of, an EIDL Loan Authorization and Agreement (the "EIDL Loan Agreement"), seeking an EIDL in the approximate amount of $150,000. In the EIDL Loan Agreement, **LICATA** falsely certified that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan."

8.      On or about May 18, 2020, in reliance on false representations made in the EIDL Application and EIDL Loan Agreement, the SBA deposited $7,000 in the form of an EIDL advance into the Boca Toxicology Account. On or about May 18, 2020, in reliance on false and

fraudulent representations made in the EIDL Application and EIDL Loan Agreement, the SBA deposited approximately $149,900 into the Boca Toxicology Account.

## Use of Wires

9.      On or about the dates specified as to each count below, in Palm Beach County, in the Southern District of Florida, and elsewhere, **CHRISTOPHER LICATA**, for the purpose of executing and in furtherance of the aforementioned scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, as described below:

| Count | Approx. Date of Application | Description of Wire |
|:-----:|:-----:|:-----|
| **16** | 4/24/2020 | Electronic transmission from **CHRISTOPHER LICATA** to Lender 1, through servers outside of Florida, of the PPP Application for Boca Toxicology. |
| **17** | 5/14/2020 | Electronic transmission from **CHRISTOPHER LICATA** to the SBA, through servers outside of Florida, of the EIDL Loan Agreement for Boca Toxicology. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(1), (a)(2)(A), (a)(7))

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for alleging criminal forfeiture to the United States of certain property in which the defendant, **CHRISTOPHER LICATA**, has an interest.

2.      Upon conviction of a violation of, or a criminal conspiracy to violate, a "Federal health care offense," as defined in Title 18, United States Code, Section 24(a), as alleged in Counts 1 through 12, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to such violation.

3.      Upon a conviction of a violation of Title 18, United States Code, Section 1957(a), as alleged in Counts 13 through 15 of this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such violation, and any property traceable to such property.

4.      Upon conviction of a violation of Title 18, United States Code, Section 1343, as alleged in Counts 16 and 17 of this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting or derived from, proceeds obtained directly or indirectly, as the result of such violation.

5.      The property, which is subject to criminal forfeiture includes, but is not limited to, the following:

(a)      All principal, deposits, interest, dividends, and any other amounts credited to account number 4318547233 held at TD Bank, N.A., in the name of Boca Toxicology;

(b)      All principal, deposits, interest, dividends, and any other amounts credited to account number 437-7125715 held at TD Bank, N.A., in the name of Boca Toxicology;

(c)      All principal, deposits, interest, dividends, and any other amounts credited to account number 4280257613 held at TD Bank, N.A. in the name of Corporate Boca Tox CL Inc; and

(d)     All principal, deposits, interest, dividends and any other amounts credited to account number 3596-0417 held at E-Trade Financial Securities LLC in the name of **CHRISTOPHER LICATA**.

All pursuant to Title 18, United States Code, Sections 982(a)(1), 982(a)(2)(A), and 982(a)(7), and the procedures outlined at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

_____
FOREPERSON

_____
JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

DANIEL KAHN
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ALLAN MEDINA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
JAMIE DE BOER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

v.

CHRISTOPHER LICATA,

_____Defendant._____/

CASE NO._____

**CERTIFICATE OF TRIAL ATTORNEY\***

**Superseding Case Information:**

**Court Division:** (Select One)

☐ Miami  ☐ Key West  ☐ FTL
☑ WPB  ☐ FTP

New defendant(s)  ☐ Yes  ☐ No
Number of new defendants _____
Total number of counts _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) _____
   List language and/or dialect _____

4. This case will take __5-7__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I    0 to 5 days        ☐
   II   6 to 10 days       ☑
   III  11 to 20 days      ☐
   IV   21 to 60 days      ☐
   V    61 days and over   ☐

   (Check only one)
   Petty        ☐
   Minor        ☐
   Misdemeanor  ☐
   Felony       ☐

6. Has this case previously been filed in this District Court? (Yes or No) **No** _____
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No** _____
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No** _____

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No** _____

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No** _____

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No** _____

_____
DOJ Trial Attorney
Court ID No.    5520601

\*Penalty Sheet(s) attached

REV 3/19/21

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**        **CHRISTOPHER LICATA**

**Case No:** _____

Count #:   1

Title 18, United States Code, Section, 1349

Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:    Twenty (20) years' imprisonment

Counts #:   2 - 6

Title 18, United States Code, Section 1347

Health Care Fraud

**\*Max Penalty**:    Ten (10) years' imprisonment as to each count

Count #:    7

Title 18, United States Code, Section 371

Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks

\*Max Penalty:    Five (5) years' imprisonment

Counts #:   8 – 12

Title 42, United States Code, Section 1320a-7b(b)(2)(A)

Payment of Kickbacks in Connection With a Federal Health Care Program

\*Max Penalty:   Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**     **CHRISTOPHER LICATA**

**Case No:**

Counts #:   13 – 15

Title 18, United States Code, Section 1957(a)

Money Laundering

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count

Counts #:   16 – 17

Title 18, United States Code, Section 1343

Wire Fraud

**\*Max Penalty:**   Twenty (20) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**